IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AARON D. DAVIS,                                    )
                                                   )
                    Plaintiff,                     )
                                                   )
            v.                                     )          1:10CV977
                                                   )
BELLSOUTH SHORT TERM DISABILITY                    )
PLAN FOR NON-SALARIED                              )
EMPLOYEES, BELLSOUTH LONG TERM                     )
DISABILITY PLAN FOR NON-SALARIED                   )
EMPLOYEES, AT&T INTEGRATED                         )
DISABILITY SERVICE CENTER,                         )
EMPLOYEES' BENEFIT COMMITTEE                       )
OF BELLSOUTH, AT&T UMBRELLA                        )
BENEFIT PLAN NUMBER 1, AT&T                        )
UMBRELLA BENEFIT PLAN NUMBER 2,                    )
BELLSOUTH TELECOMMUNICATIONS,                      )
INC., and AT&T CORPORATION,                        )
                                                   )
                    Defendants.                    )

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

        This matter comes before the Court on a Motion for Summary Judgment filed by

Plaintiff [Doc. #29], and a Motion for Summary Judgment filed by Defendants [Doc. #31].  In

this action, Plaintiff has asserted claims for (1) short term disability benefits under an employee

benefit plan regulated pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"),  29 U.S.C. §§ 1001-1461 (2006); (2) long term disability benefits under the same

employee welfare plan; and (3) ancillary benefits provided to recipients of the benefits sought

in Counts One and Two.  For the reasons stated below, this Court recommends that Plaintiff's

Motion for Summary Judgment be granted as to short term disability benefits, that Defendants'

Motion for Summary Judgment be denied, and that this action be remanded to the Plan Administrator for a determination of Plaintiff's entitlement to long term disability benefits.

## I.    CLAIMS AND PROCEDURAL HISTORY

Plaintiff Aaron Davis ("Plaintiff") brings his ERISA claims in this case for disability benefits under an employee benefit plan. At the onset of his alleged disability in 2008, Plaintiff was employed as a customer service assistant by BellSouth Telecommunications, Inc. ("BellSouth"), a subsidiary of AT&T, Inc. ("AT&T"). At the relevant time, Plaintiff was a "participant" in the AT&T Umbrella Benefit Plan Number 1. The AT&T Umbrella Benefit Plan Number 1 included both the BellSouth Short Term Disability Plan for Non-Salaried Employees (STD Plan) and the BellSouth Long Term Disability Plan for Non-Salaried Employees (LTD Plan). Plaintiff was a "participant" in both the STD Plan and the LTD Plan. Both of these plans are ERISA plans. In addition to these two plans, Bellsouth provided health care and other benefits to its current and former employees.[1]

---

[1] Plaintiff named as Defendants in this case: (#1) the BellSouth Short Term Disability Plan for Non-Salaried Employees; (#2) the BellSouth Long Term Disability Plan for Non-Salaried Employees; (#3) the AT&T Integrated Disability Service Center; (#4) the Employees' Benefit Committee of BellSouth; (#5) AT&T Umbrella Benefit Plan Number 1; (#6) AT&T Umbrella Benefit Plan Number 2; (#7) BellSouth Telecommunications, Inc.; and (#8) AT&T Corporation.

According to the Declaration of Nikki L. Chriesman [Doc. # 33], a senior benefits analyst for AT&T Services, Inc., the BellSouth Short Term Disability Plan (#1) and the BellSouth Long Term Disability Plan (#2) merged into and are now component programs under the AT&T Umbrella Benefit Plan Number 1 (#5). Ms. Chriesman further states that the AT&T Integrated Disability Service Center (#3) is a group of employees at Sedgwick Claims Management Services, Inc. (the Claims Administrator) assigned to handle disability benefit claims, so the Claims Administrator should be properly identified as Sedgwick Claims Management Center rather than AT&T Integrated Disability Service Center. According to Ms. Chriesman, the Employees' Benefit Committee of BellSouth (#4) has no role in the administration of the AT&T Umbrella Benefit Plan Number 1. Further, Mr. Chriesman contends that AT&T Corporation (#8) was not Plaintiff's employer and has no role in the administration of the Plan. Finally, Ms. Chriesman states that the AT&T Umbrella Benefit Plan Number 2 (#6) does not provide STD and LTD disability benefits to BellSouth employees. Thus, Ms. Chriesman's summary addresses Defendants 1, 2, 4, 6, and 8, leaving only the AT&T Umbrella Benefit Plan Number 1 (#5), Bellsouth Telecommunications, Inc. (Plaintiff's employer) (#7), and Sedgwick Claims Management Services, Inc.,

The STD Plan provides benefits for the period that a participant is disabled, up to 52 weeks. As relevant to this action, the STD Plan defines "disability" in the following manner:

> "Disability" means as of the eighth consecutive calendar Day of Absence a medical condition supported by objective medical evidence, which (i) makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury or (ii) results in a Participant receiving treatment that qualifies as a Chemical Dependency Confinement. "Any type of work" includes the following regardless of availability: (a) the Participant's regular job with or without accommodations, (b) any other Participating Company job with or without accommodations, or (c) temporary modified duties. "A Participating Company job" is any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and functions.

(DEF 83.)[2] With respect to the LTD Plan, a covered employee is eligible for long term disability benefits if he is disabled "for a period beyond the Waiting Period as a result of illness or injury."

(DEF 131.) "'Waiting Period' means the 52-week period for which benefits under the Short Term Disability Plan are payable (and all benefits payable under such Plan were exhausted) and for which no benefits are payable under this Plan." (DEF 130.) The LTD Plan defines "disability" as follows:

> "Disability" means a continuous physical or mental illness, whether work-related or non-work related, which renders a Participant unable to perform any type of work other than one

---

the Claims Administrator (improperly identified as AT&T Integrated Service Center) (#3). In Response, Plaintiff does not dispute these contentions. Cf. McRae v. Rogosin Converters, Inc., 301 F. Supp. 2d 471, 475 (M.D.N.C. 2004) (noting that the plaintiff may bring an action for benefits against the Plan itself as an entity and any fiduciaries who control administration of the Plan). Accordingly, the Court concludes, without objection by Plaintiff, that the proper Defendants are the AT&T Umbrella Benefit Plan Number 1, Sedgwick Claims Management Services, Inc. as the Claims Administrator, and BellSouth Telecommunications. Therefore, these three entities will be referred to as the "Defendants" in this matter.

[2] In the record, the parties have designated the Plan documents as "DEF __."

which pays less than half of his base pay on the day immediately preceding the day his benefits under the Short Term Disability Plan began.

(DEF 129.)

In September 2008, Plaintiff contends that he began experiencing severe panic attacks, increasing anxiety, and anger outbursts, and further contends that he was not bathing or attending to his personal hygiene due to significant mental health impairments. Plaintiff went to see his clinical psychiatrist, Dr. Crandell, several times in September and October 2008 for treatment of his escalating symptoms. On October 23, 2008, Dr. Crandell determined that in light of Plaintiff's symptoms, it would not be appropriate for him to return to work.

Plaintiff sought and was approved for short term disability benefits for his mental health disorders beginning on September 24, 2008. However, Plaintiff's short term disability benefits were terminated on July 9, 2009.[3] (AR 373-74.) Plaintiff had not returned to work since the onset of his alleged disability in September 2008, and his employment was ultimately terminated on March 1, 2010. Plaintiff appealed the July 9, 2009 denial of his short term disability benefits, but his first appeal was denied in October 2009. (AR 549-51.) His second appeal was denied in April 2010. (AR1059-61.) Plaintiff also sought long term disability benefits under the LTD Plan, but his request was denied in September 2009 because he had not exhausted the 52-week

---

[3] Plaintiff was subsequently approved for short term disability benefits based on an orthopedic condition from September 3, 2009 through October 2, 2009 (AR 389) and from October 8, 2009 through November 12, 2009 (AR 601). This period was related to a surgery, a right ulnar nerve release on his right elbow, that Plaintiff underwent on September 3, 2009. (AR 543-44.) Plaintiff's employer subsequently confirmed that they could accommodate this injury through a "wrist splint and elbow pad." (AR 151, 604-06). However, this accommodation did not address Plaintiff's mental condition or whether Plaintiff would be cleared to return to work in light of those conditions. Plaintiff does not argue that this orthopedic condition caused a disability relevant to this action. Therefore, Plaintiff's orthopedic condition is not at issue in the present suit.

waiting period necessary before long term benefits could be awarded under the LTD Plan. Because of the denial on this basis, Defendants did not make a final determination on whether Plaintiff met the substantive Plan requirements for long term disability benefits. (AR 1186-87.)

Plaintiff claims that Defendants wrongfully terminated his short term disability benefits and wrongfully denied his application for long term disability benefits under the respective plans. His first claim for relief is for the alleged wrongful termination and denial of short term disability benefits. Plaintiff's second claim for relief is for the alleged wrongful denial of long term disability benefits. Finally, Plaintiff's third claim for relief is for the alleged wrongful termination of his other employment benefits. As relief, Plaintiff seeks declaratory judgments that he is entitled to both short term and long term disability benefits, to recover all benefits to which he is entitled under the STD and LTD Plans, to be granted equitable and injunctive relief in the form of an order that he be reinstated and reimbursed for losses he has sustained, to recover interest on amounts that he recovers, and to recover reasonable attorney's fees.

II.     STANDARD OF REVIEW IN ERISA CASES

"The Employee Retirement Income Security Act of 1974 (ERISA) permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008) (citing 29 U.S.C. § 1001 et seq.; 29 U.S.C. § 1132(a)(1)(B)). In Glenn, the Supreme Court noted that "ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator 'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the

plan; it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators provide a 'full and fair review' of claim denials, and it supplements marketplace and regulatory controls with judicial review of individual claim denials." Id. at 115 (citing 29 U.S.C. § 1104(a)(1), § 1133(2), § 1132(a)(1)(B)) (internal citations omitted).

The Fourth Circuit has relied on the decisions of the Supreme Court to set out basic guidelines for "judicial review of ERISA plan determinations." Champion v. Black & Decker (U.S.), Inc., 550 F.3d 353, 358 (4th Cir. 2008). First, "a reviewing court must be guided by principles of trust law, taking a plan administrator's determination as 'a fiduciary act (i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries).' Second, courts must 'review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary.' Third, when the plan grants the administrator 'discretionary authority to determine eligibility for benefits, ... a deferential standard of review is appropriate.' And fourth, '[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.'" Champion, 550 F.3d at 358 (quoting Glenn, 128 S. Ct. at 2347-48) (internal citations omitted).

In the present case, under the STD Plan, the Plan Administrator is given the authority "[t]o interpret and construe, in its sole discretion, the Plan, and to decide all questions of eligibility of any person to participate in the Plan or to receive Benefits under it, and its interpretation thereof shall be final and conclusive." (DEF 91.) According to the Plan, the Plan

Administrator[4] has delegated to the Claims Administrator[5] the duty to administer all claims for Plan benefits.  (DEF 116.)  Similarly, with respect to the LTD Plan, the Plan Administrator is given authority to interpret and construe the Plan, "in its sole discretion," and to decide the eligibility of any person to participate in the Plan or to receive benefits under the Plan.  (DEF 135.)

Thus, because the Plans give the Plan Administrator the "sole discretion" to determine all questions of eligibility for benefits, this Court's standard of review in the present case is an abuse of discretion standard.  See Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 629-30 (4th Cir. 2010).  Under this standard, a court does not disturb a plan administrator's decision if it is "reasonable."  Id. at 630.  A decision is "reasonable" if it: (1) results from a deliberate, principled reasoning process; and (2) is supported by "substantial evidence."  Id.  "Substantial evidence" is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  DuPerry v. Life Ins. Co. of North Am., 632 F.3d 860, 869 (4th Cir. 2011).  The Fourth Circuit has identified several factors relevant to the determination of reasonableness: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier

---

[4] The Plan Administrator was originally BellSouth Corporation (DEF 116), but became AT&T, Inc. (DEF 164), although Defendants contend that the Plan Administrator is now AT&T Services, Inc.  (Decl. of N. Chriesman [Doc. #33] at 2.)

[5] The Claims Administrator was originally Broad Spire and  is now Sedgwick Claims Management Services, Inc.  (DEF 166.)  A sub-group within Sedgwick Claims Management Services, Inc. is referred to as the AT&T Integrated Disability Service Center.  For ease of reference, Sedgwick Claims Management Services, Inc. and the AT&T Integrated Disability Service Center will be referred to generally as "Sedgwick" as the Claims Administrator in this case.

interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motive and any conflict of interest it may have.[6] Williams, 609 F.3d at 630.

Finally, the Court also notes that in conducting judicial review in an ERISA case under the deferential standard of review, the Court is limited to the record that was before the Plan Administrator. See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994) ("[A]n assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time. Thus, although it may be appropriate for a court conducting a *de novo* review of a plan administrator's action to consider evidence that was not taken into account by the administrator, the contrary approach should be followed when conducting a review under either an arbitrary and capricious standard or under the abuse of discretion standard."); see also Williams, 609 F.3d at 631-32 (noting that review in such an ERISA case is "based solely on the existing administrative record, rather than on any testimony or other additional evidence obtained outside the administrative record").[7]  Therefore, this Court's review in this matter involves a review of the undisputed Administrative Record.  This Court will therefore proceed to consideration of the parties' cross-Motions for Summary

---

[6] Plaintiff does not contend that Defendants acted under a conflict of interest.  Therefore, the Court does not consider any conflict of interest in this case.

[7] The Court notes, however, that the plan administrator cannot limit the record or the Court's review by "blatantly disregard[ing] an applicant's submissions," and where appropriate, the Court may consider the testimony of the parties and their evidence in determining what evidence was actually before the plan administrator during the claims process.  Hess v. Hartford Life & Accident Ins. Co., 274 F.3d 456, 462-63 (7th Cir. 2001).  In the present case, there is no dispute regarding the contents of the administrative record.

Judgment contesting the reasonableness of the decision in this case, based on the evidence in the record regarding Plaintiff's alleged disability. In undertaking this consideration, the Court will begin with the evidence proffered by Plaintiff and included in the record before the Plan Administrator, and will then turn to the evaluations and conclusions by professionals employed or retained by Defendants.[8]

## III.    ANALYSIS OF THE RECORD REGARDING SHORT TERM DISABILITY

### A.    Plaintiff's Evidence of Disability

With respect to the evidence presented by Plaintiff in support of his claim for disability benefits, the Court notes that the Administrative Record contains numerous treatment notes of Plaintiff's treating psychiatrist, Dr. Jason Crandell. Dr. Crandell's notes cover a period from January 2005 (AR 646) through February 2010 (AR 739), and detail approximately 93 office visits of Plaintiff. As early as January 2005, Dr. Crandell diagnosed Plaintiff as having "Bipolar affective disorder type 1 with most recent episode being depression." (AR 646.) Dr. Crandell noted that Plaintiff had a past history of alcohol abuse currently in remission, and history of

---

[8] To the extent that this case is presently before the Court on cross-motions for summary judgment, the Court notes that summary judgment is appropriate only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). The Fourth Circuit has stated that "[t]he propriety of importing the summary judgment standard whole-cloth into the ERISA context has already received extensive attention from a sister circuit [and] such perplexities arise chiefly when courts are reviewing claims for benefits under 29 U.S.C. § 1132(a)(1)(B)." Phelps v. C.T. Enter., Inc., 394 F.3d 213, 218 (4th Cir. 2005) (citing Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 617 (6th Cir.1998)); see also Lamb v. Nextel Communications of Mid-Atlantic, Inc., 2010 WL 4068520 (E.D. Va. 2010) (discussing the various procedural issues at length). As discussed in those cases, a deferential review of an administrative record in an ERISA case does not fit neatly into a determination of whether there are genuine disputes of material fact for trial. Moreover, since no additional evidence is received in ERISA cases involving deferential review, if summary judgment is denied, the trial is generally a bench trial "on the papers." See, e.g., Stewart v. Bert Bell/Pete Rozelle NFL Player Retirement Plan, 2012 WL 122362 (D. Md. 2012). This Court need not further delve into these procedural issues in the present case, however, as the parties do not point to genuine disputes of material facts for trial, and instead focus only on whether the decision of the Plan Administrator was unreasonable as a matter of law based on the undisputed record.

multiple suicide attempts early in his illness. (Id.) Dr. Crandell also diagnosed Plaintiff with obsessive-compulsive disorder. (Id.) In October 2005, Dr. Crandell diagnosed Plaintiff with Generalized Anxiety Disorder, with a history of panic attacks. (AR 660.) The treatment notes further reflect that Dr. Crandell prescribed several medications for Plaintiff, including Depakote 500 mg, Wellbutrin 200 mg, Topamax 100 mg, Nexium 40 mg, Ambien 10 mg, and Zoloft as of February 2005. (AR 647.)

Dr. Crandell's treatment notes further reveal that in September 2008, Plaintiff began to have increasing panic attacks and anxiety, and Dr. Crandell diagnosed Plaintiff with Panic Anxiety Disorder with mild Agoraphobia, in addition to Bipolar I disorder, Generalized Anxiety Disorder, and Obsessive Compulsive Disorder. (AR 699-702.) During October 2008, Dr. Crandell increased Plaintiff's dosage of resiperidone (Risperdal), an antiphsychotic medication. (AR 704). The notes reflect that Plaintiff's antipsychotic medication was later switched to ziprasidone (Geodon) and ultimately to aripiprazole (Abilify). Dr. Crandell's treatment notes further reveal that by November and December 2008, Plaintiff was suffering from delusional ideation and paranoia, as well as suicidal intentions (AR 708).[9] Dr. Crandell's notes in January and February 2009 indicate Plaintiff was suffering from continued anxiety and increased avoiding of public places, with paranoia and hyper vigilance. (AR713-14.) The notes in March 2009 also increasingly indicate that Dr. Crandell had concerns that Plaintiff may be at risk of violence or altercations due to Plaintiff's mental conditions. (AR 715-17.) In May and June 2009, Dr. Crandell's notes also reflect increasing concerns regarding Plaintiff's cognition, and

---

[9] In his conversations with Sedwick regarding Plaintiff's condition, Dr. Crandell noted that Plaintiff's symptoms were also suggestive of schizoaffective disorder. (AR 30.)

well as Plaintiff's continuing anxiety, panic attacks, avoiding public social settings, temper outburts, and suspiciousness. (AR 720-22.) In July and August 2009, Dr. Crandell's notes indicated that Plaintiff had become verbally confrontive in social settings, including a verbal altercation with a cashier, as well as continued panic episodes, avoidance of public settings, and suspiciousness of others. (AR 723-27). Dr. Crandell also continued to note his concerns regarding Plaintiff's cognitive impairments through September 2009. (AR 727-29.) Dr. Crandell's treatment of Plaintiff continued similarly through November and December of 2009. (AR 730-37.) As of February 2010, Plaintiff was prescribed Abilify 10 mg, Requip 1 mg, Depakote ER 500 mg, Zoloft 200 mg, Inderal 10 mg, Ambien CR 12.5 mg, and Klonopin 1 mg. (AR 739.)

Dr. Crandell's treatment and conclusions are set out in a letter to Ms. Angela Debolt of Sedgwick[10] that Dr. Crandell wrote in October 2009 regarding objective clarification of Plaintiff's disability. (AR 575-76.) In that letter, Dr. Crandell wrote that Plaintiff is experiencing "ongoing difficulty with mood/irritability, trouble with concentration and memory, and escalating anxiety when involved in social situations" and that these conditions are the "driving forces" behind Plaintiff's current disability. (AR 575.) Dr. Crandell noted that he had "observe[d] in session" with Plaintiff that if Plaintiff is pressed with certain questions that he finds intrusive or irritating, Dr. Crandell started to see "increased psychomotor restlessness and some arising agitation." (Id.) Dr. Crandell noted that Plaintiff's family reported that Plaintiff does not control these symptoms as well at home as Plaintiff does in the doctor's office setting.

---

[10] As noted above, Sedgwick Claims Management Services is the Claims Administrator, and includes the AT&T Integrated Disability Service Center.

Dr. Crandell wrote that Plaintiff's solution is "just to stay at home and not go out in the public." (Id.) Dr. Crandell stated that his concern is that Plaintiff's behavior "would not be tolerated in his prior workplace or any workplace that involved minimal interactions with other people." (Id.)

In his letter, Dr. Crandell also provided Sedgwick with a review of the results of the neurocognitive testing he performed on Plaintiff in August 2009. Dr. Crandell reported that Plaintiff had great difficulty remembering words he had been given on a list, remembering pictures he had previously been shown, as well as with "cognitive flexibility." (Id.) Plaintiff's "neuro-cognitive index" scaled at a level that "would be unacceptable in any workplace." (Id.) Dr. Crandell expressed his "concern . . . that [Plaintiff's] level of anxiety has some underlying effect on driving some of the difficulties that [Plaintiff] has processing information and shifting attention from one task to another." (AR 575-76.) Dr. Crandell also noted that when Plaintiff was tested under time limits, his "accuracy [was] notably impaired." (AR 576.) Dr. Crandell observed that through the years of treatment, Plaintiff had exhibited a level of distrust of others which over the past few months had become "more of an issue despite anti-psychotic treatment." (Id.) Dr. Crandell stated that even in an "isolated work environment" Plaintiff would need supervision, direction, and motivation to be successful and that Plaintiff's reaction to such a supervising authority would create a "very tense situation." (Id.) In summary, Dr. Crandell concluded that Plaintiff's "chronic socially avoidant and paranoid interpersonal style would be as disabling as his primary Bipolar Affective diagnosis." (Id.) "The two together

would create a situation that would be very unpredictable and at best could survive only on a very limited and short term basis in any work setting." (Id.)

Dr. Crandell subsequently submitted to Sedgwick a more lengthy statement describing Plaintiff's conditions. (AR 894-908.) He stated that Plaintiff is "easily brought to a hot temper with an associated risk of becoming volatile, thereby creating an extremely dangerous environment for" Plaintiff and his co-workers and supervisors. (AR 894.) Dr. Crandell noted that Plaintiff's illness had been long-standing but had taken "a turn for the worse" beginning in 2005. (AR 896.) Dr. Crandell further stated that by September 2008, he "was concerned that [he] was no longer able to insure the safety of [Plaintiff] and his co-workers and supervisors, and reached the professional conclusion that [Plaintiff] should stay out of work." (Id.)

In his letter, Dr. Crandell noted in detail the objective and subjective evidence of Plaintiff's "major mental illness." (AR 903-07.) Dr. Crandell specifically pointed to Plaintiff's cognitive deficits and his risk for violent behavior if he returned to work. (AR 907.) Dr. Crandell concluded by noting that it was his opinion that Plaintiff "is totally and permanently disabled from any kind of work and has been disabled since September of 2008." Dr. Crandell did not "anticipate that [Plaintiff] will ever be able to return to any kind of job." (Id.)

In his letters and office notes, Dr. Crandell also noted the inability of Plaintiff to care for his personal affairs, necessitating the intervention of Plaintiff's family, especially his sister. (AR 898, 901.) Plaintiff's sister, Stephanie Donithan, submitted her own statement detailing her experiences with Plaintiff. She recounted two suicide attempts made by Plaintiff, the first when he was approximately 21 years old followed by the second a few years later. (AR 771.)

According to Ms. Donithan, Plaintiff was also involved in an altercation in 1991 during which Plaintiff "pulled out a gun, a struggle ensued, and the gun went off," injuring the other person. (Id.) Ms. Donithan has seen Plaintiff show signs of paranoia, severe rage, and a fear of leaving his home. (AR 772-73.) In October 2008, she found Plaintiff's home to contain "clothing in piles . . . with dog hair (piles of it) on the clothing." (AR 773.) Clothes had "soured" and "begun to grow mildew/mold." (Id.) There were no wash cloths in his house and the towels had also grown mold. (Id.) There were only tiny paths one could walk on inside the house among the various objects "stacked almost to the ceiling." (Id.) His kitchen could not be seen due to trash being everywhere. (AR 774.) There was no working toilet in the home; Plaintiff had been without a toilet for a year and was using the woods as his bathroom. (Id.) Plaintiff's bedroom was "covered up in papers, mail, magazines, etc." (Id.) There were holes in the floor of the home from dogs urinating and defecating in the home. (Id.) Weeds had overgrown the land around Plaintiff's home and reached "up to the windows of his home." (Id.) There was no working refrigerator in the home and when turned on the stove smelled of rat/mice feces burning. (Id.) The house was infested with rodents. (Id.) She submitted some photographs of the house to Sedgwick. Plaintiff's parents moved back to the area to assist with Plaintiff's needs. (Id.)

Plaintiff's sister also related that she filed the paperwork for Plaintiff to receive Social Security Disability benefits which were granted to him in November 2008. (AR 779, 1165.) The Social Security Administration determined that Plaintiff could not handle his own funds, so it

appointed his sister to receive his checks.  (AR 779.)  She now ensures that Plaintiff's bills are paid and that his daily needs are met.  (Id.)

Plaintiff also submitted his own statement in February 2010 describing his medical and living conditions.  (AR 783-787.)  He states that his sister has to help him with his personal bathing and grooming and that he cannot handle his own financial affairs.  (AR 786.)  He recounts his long work history but says that now his "life is very different."  (Id.)  He "always feel[s] exhausted, ha[s] extreme fatigue, and [doesn't] get enough sleep."  (Id.)  He is "confined to [his] home."  (Id.)  Plaintiff states that he wishes that he could return to work.  (Id.)

Finally, Plaintiff submitted a report from Sandra Frost,  a case manager for Carolina Case Management & Rehabilitation Services, Inc., regarding Plaintiff's vocational employability in March 2010.  (AR 994-1001.)  Ms. Frost reviewed Plaintiff's medical records, including the conclusions of Dr. Crandell, and reviewed his vocational and military service history.[11]  Ms. Frost also interviewed Plaintiff.  Ms. Frost noted that Plaintiff had deteriorated to the point that he "is unable to drive himself anywhere," is "unable to even walk to his own mailbox," is "unable to read due to lack of concentration and inability to maintain a train of thought," becomes "verbally combative" when agitated, and "cannot control his level of agitation and emotion in particular situations."  She found that he "suffers from debilitating, stress-related cognitive deficits."  She also found that "[d]ue to the severity of his bipolar disorder, he can and does easily mischaracterize others' conduct as hostile or agitated.  Due to this level of anxiety and his

_____

[11] According to Dr. Crandell's notes, Plaintiff had a lengthy psychiatric hospitalization while he was in the Armed Services, and was medically discharged from the Army after he made threatening comments to a Sergeant.  (AR 790, 584.)

potentially violent reactions, **I would have sincere concern for the safety and welfare of Mr. Davis and his co-workers and supervisors if Mr. Davis were to return to work. Mr. Davis is at risk for violent behavior**." (AR 1001, emphasis in original.) Ms. Frost further noted that "[n]o employer can accommodate the limitations caused by Mr. Davis's mental conditions" and that, in fact, "it is inconceivable to me that any employer would assume the documented risks of hiring Mr. Davis." Ms. Frost therefore concluded that Plaintiff "is not employable at this time and has been unemployable since July, 2008." (Id.)

B.     Defendants' Review of Plaintiff's Claims

Plaintiff's claims were reviewed by several professionals employed or retained by Sedgwick. On December 17, 2008, Dr. Kathleen Grimes, a licensed psychologist retained by Sedgwick, spoke with Dr. Crandell. Based on that conversation, Dr. Grimes noted that Plaintiff was suffering from various mental health impairments, resulting in significant cognitive impairment, problems with daily functioning, a history of suicide attempts, a progressive worsening of his condition in the last couple of years, paranoia toward others, and past volatile episodes at work with coworkers. (AR 30-31.) Dr. Grimes therefore concluded that Plaintiff suffered from a global psychiatric impairment of sufficient severity to preclude work activity at that time, with a poor prognosis for any future return to work due to his severe, chronic psychiatric condition. (AR 31.)

Sedwick next retained Dr. Catherine Clodfelter, a psychologist, to perform an independent medical evaluation of Plaintiff on February 26, 2009. Dr. Clodfelter administered a battery of psychological tests to Plaintiff. In her report, Dr. Clodfelter noted that the cognitive

testing showed that he had mild deficits in immediate memory, his delayed memory was moderately impaired, and he had significant deficits on multiple measures of a test of executive function. Dr. Clodfelter also noted that Plaintiff "passed all measures of a medical symptom validity test having to do with the validity of any cognitive or memory problems" and "[o]f note, he did pass a symptom validity test measuring his effort on the cognitive tests." In addition, Dr. Clodfelter noted that his "extensive psychiatric history suggests serious problems" and "[h]is self-report of severe interpersonal problems, as well as anger management problems, would potentially limit or restrict his functioning in the work setting." However, Dr. Clodfelter also noted that Plaintiff "scored very high on a scale [of the MMPI-2] designed to detect exaggerated complaints of disability in the context of forensic evaluations." Dr. Clodfelter concluded that it was "impossible to make any accurate appraisal of [Plaintiff's] overall psychological status, since he consistently exaggerated and over-reported a myriad of complaints and symptoms." (AR 247.) She also found that there was "no valid or reliable evidence, as to the severity of the claimant's psychological problems." (Id.) This was due to her "overarching finding" that Plaintiff "exaggerates and over-reports his problems." (Id.) That "finding" also prevented Dr. Clodfelter from making "any confident statement about [Plaintiff's] prognosis to return to any occupation within any foreseeable timeframe." (AR 248.)

However, a notation to Plaintiff's claims record dated March 11, 2009 reveals that Dr. Grimes, the psychologist employed by Sedgwick, requested an addendum to Dr. Clodfelter's independent medical examination including "actual scores for all of the MMPI-2 scales." (AR 50.) The note further states:

The validity of conclusions drawn by evaluator regarding EE's functioning/ability to RTW is in question as evaluator cited EE's elevated score on the FBS (Fake Bad Scale) as evidence that EE's profile was invalid and EE malingering. However, Dr. John Graham who was a major contributor to the development of the MMPI-2 wrote in the book, "MMPI-II Assessing Personality and Psychopathology 4th Edition" that "Published research with the FBS does not support its validity for its intended purpose." "A meta-analysis of MMPI-II malingering studies (Rogers et al., 2003) revealed that the FBS has been quite ineffective in identifying malingerers and, in fact, had the worst validity for this purpose of all of the MMPI-II scales included in the meta-analysis. It is this author's recommendation that the FBS not be used to identify malingering for psychopathology on the MMPI-II."

(AR 50.)

On March 13, 2009, Dr. Grimes entered another note in Plaintiff's claims record in which she stated that she had spoken with Dr. Crandell on March 11. (AR 51.) They discussed Dr. Clodfelter's IME results which Dr. Crandell "did not think" were an "accurate reflection of EE's current functioning and that EE needed to have a psychiatric evaluation instead." (Id.)[12] Dr. Grimes recounted Plaintiff's current condition as relayed by Dr. Crandell. This included a discussion of Plaintiff's potential dangerousness toward others, as to which Dr. Crandell opined that Plaintiff "recognizes that he does not have good control of impulses, is not expressing any HI [Homicidal Intentions] towards any specific individual, but could lose his temper and MD [Dr. Crandell] unsure how he [Plaintiff] would express this." (AR 52.)[13] Dr. Grimes concluded

_____

[12] Dr. Crandell's office note for Plaintiff's visit after the IME indicated that Plaintiff "was very defensive and postured during the testing procedure" and "felt the psychologist was trying to 'bate [sic] him into having some type of reaction.'" (AR 249.) Dr. Crandell concluded that Plaintiff "has a significant paranoid interpersonal style that impairs his ability to interact appropriately with others" and "places him at risk for violence and altercations." (Id.)

[13] Another note in Plaintiff's claims chart after this entry indicated an office visit with Dr. Crandell a few weeks later, during which Plaintiff stated that he had been having "bloody nightmares" and "pictures himself

that the "medical info from EE's psychiatrist supports global psychiatric impairment of a severity that would preclude all work activity any occupation." (AR 52.) Dr. Grimes reiterated that she "has questions a/b the validity of findings from the recent IME suggesting that EE malingering/exaggerating his sxs as it appears that the examiner may have incorrectly interpreted findings from MMPI-2." (AR 52).

According to the notes in Plaintiff's claims record, an assessment of the MMPI-2 results concluded that "[t]he client responded to the MMPI-2 items in an extremely exaggerated manner, endorsing a wide variety of rare symptoms and attitudes. These results may stem from a number of facts that include excessive symptom checking, falsely claiming psychological problems, low reading level, a plea for help, or a cofused [sic] state. . . . The situation in which he took the test should be further evaluated. If the individual can read well enough and is oriented and cooperative enough to retake the test, another test administration is recommended." (AR 134-135.) However, no additional MMPI-2 testing is reflected in the claim notes.

On April 24, 2009, Dr. Grimes noted in Plaintiff's claims record that she had received the addendum to Dr. Clodfelter's IME. (AR 57.) She recounts her concern with the conclusion that Plaintiff was malingering and states that authors of "Psychological Assessment with the MMPI-2" "indicate that it is more appropriate to utilize the Fp (Infrequency-psychopathology) validity scale when attempting to distinguish patients w/schizophrenia from those feigning this type of psychiatric diagnosis whereas the F and Fb are more useful in distinguishing patients

---

beating up men, which he [Plaintiff] finds rather odd since he works with women" although "[h]e denies any formed harmful intent towards any particular person." (AR 56.)

with depression from those feigning depression. They indicate that significantly elevated F scale scores (F and Fb) would be consistent with severe psychopathology and not malingering when an individual's responses are reliable and consistent (VRIN and TRIN scores not elevated ) and the Fp is not significantly elevated as in the EE's case." (AR 58.) She concludes that the "EE's MMPI-2 findings are indicative of serious psychopathology consistent w/ the EE's dx of schizoaffective d/o and not malingering." (Id.) Dr. Grimes further states that she specifically "disagree[s] w/ the IME evaluator's conclusion that the EE's MMPI-2 results suggest that he is malingering and do not support disability. Rather, as noted above, the EE's MMPI-2 results are consistent w/ severe psychopathology that would preclude the EE's ability to work in any capacity at this time." Dr. Grimes noted that she believes that the "EE's prognosis for a successful RTW is poor given that he has a chronic and severe form of mental illness. It would be advisable to consider referring the EE for more intensive tx such as IOP or PHP given the severity of his condition." (Id.) On June 5, 2009, Dr. Grimes reviewed Plaintiff's claim and medical information and again concluded that he continued to experience "significant emotional instability and impairment in social and cognitive functioning" and ability to perform activities of daily living. (AR 67.)

Plaintiff's file was apparently set for review in June and July 2009. (AR-69-72.) On June 11, 2009, Case Manager Barbara Kelly undertook an "8-month review." (AR 69.) In the review, she listed Plaintiff's medications and noted that "[i]n order for ee to [return to work] his medication will need adjusting so that he is not in a continual stupor." (AR 70.) The Case Manger further states that "[a]ccording to PA, EE is psychiatrically impaired to a severity that

would preclude him for all work activity. Prognosis for ee to return to work unlikely, ee will likely transition to LTD. . . . Prognosis for a [return to work] is poor given ee's chronic and severe form of mental illness." (AR 70.) However, in the review a few weeks later, on July 6, 2009, the same Case Manager summarized Dr. Crandell's recent office visit notes, which indicated an unchanged diagnosis and medications, and concluded that "EE is getting better, current GAF is 55, meds have not changed since May, ee does not have panic attacks and reported only one temper outburst." (AR 72.)[14]

Defendants next retained Dr. Phan, a psychiatrist, to perform an independent psychiatric evaluation of Plaintiff on August 3, 2009. (AR 746.) Dr. Phan diagnosed Plaintiff much the same as Dr. Crandell, with Bipolar Disorder, Generalized Anxiety Disorder, Panic Disorder, and Obsessive Compulsive Disorder. (AR 749.) Dr. Phan noted that even on medication, "he has not been able to control his temper effectively." Dr. Phan's conclusion was that Plaintiff "can not return to his present occupation or return to work in any occupation in another six months at which time he should have another evaluation to see if he could go back to work in another

---

[14] This determination was apparently based on the June 17 office notes of Dr. Crandell. However, the June 17 office notes of Dr. Crandell indicate that Plaintiff was actively avoiding public situations and spent almost all of his time alone at home. (AR 722.) Plaintiff recounted that to avoid large crowds he goes to a quick mart near his house instead of going to a grocery store. (Id.) Dr. Crandell noted that Plaintiff appeared anxious, his affect was stable, there was no "lability or harmful thought," although he did have "one volatile temper episode with his mom." (Id.) Dr. Crandell continued Plaintiff's same medications and the plan was to continue current treatment with follow-up therapy in 3 weeks. (Id.) Dr. Crandell's subsequent July 1, 2009 office notation, which is recorded in Plaintiff's claims record on July 8, 2009, reveals that in that same time frame, Plaintiff had become "verbally confrontive" with a cashier and stormed out of the store after a verbal altercation. (AR 76.) The note also references a panic attack that is described as a "significant panic episode." (Id.) The July 8, 2009 entry also indicates that Dr. Crandell had noted Plaintiff's "distrust and suspiciousness of others" during the office visit, and that Plaintiff's family continues to assist with bill pay, stocking Plaintiff's home with food, and with Plaintiff's personal hygiene matters. (Id.) According to the claims record, Dr. Crandell performed cognitive tests which showed results "not as good as [Dr. Crandell's] previous notation." (Id.) Plaintiff's diagnosis was unchanged and therapy was continuing. (Id.)

capacity." (AR 750.) Dr. Phan noted that "[a]s far as returning to AT&T, I do not think the patient will ever be able to return to this job even though he had committed to himself to work up to his retirement at 30 years. But at 28 years he is afraid he will blow up at someone." (Id.)

On August 21, 2009, Dr. Grimes entered a notation in Plaintiff's claims record summarizing the report of Dr. Phan as well as Dr. Crandell's notes of Plaintiff's August 12, 2009 office visit.[15] (AR 85-86.) However, at this point, Dr. Grimes concluded for the first time that Plaintiff's "available medical info does not support global psychiatric impairment of a severity that would preclude all work activity any occ," despite the conclusion of Dr. Phan's independent medical examination two weeks earlier that Plaintiff could not return to any occupation at that time. (AR 86.) Dr. Grimes acknowledged that Plaintiff complained of difficulty controlling his temper, but she states that this difficulty was "not of sufficient severity to warrant adjustment of his medications." (Id.) Dr. Grimes had left a voicemail for Dr. Crandell to "clarify functionality," but he had not returned the call at that time of the entry. On August 28, 2009, Dr. Grimes reviewed test results from Dr. Crandell of neurocognitive testing on Plaintiff performed on August 24, 2009. (AR 90-91.) These tests showed "significant impairment in composite and verbal memory, processing speed, executive function, psychomotor speed, reaction time and cognitive flexibility." (AR 90.) Dr. Grimes considered these results not to be consistent with "MSE findings from the IME" and noted that "no cognitive validity testing was

_____

[15] Dr. Crandell's August 12, 2009 note of Plaintiff's office visit reveals that Plaintiff sometimes is unable to control his temper when interacting with check out clerks, that he is easily frustrated, tends to avoid public contact as much as possible, and continues to be emotionally supported by his family. (AR 725.) On examination, Plaintiff's "affect was stable," he appeared "a little nervous," but with no "lability or harmful thought." (Id.) The plan was to continue current medication and psychotherapy sessions. Dr. Crandell notes that Plaintiff is "to remain on disability" and that "[d]isability will go into long term after September 17th." (Id.)

conducted to assess whether the EE's test results are d/t poor effort and malingering." (AR 91.) Dr. Grimes concluded that the report of neurocognitive testing from Dr. Crandell required no change in the previous determination that the medical information did not substantiate disability. (Id.) Dr. Grimes thus apparently based this conclusion on Dr. Clodfelter's concerns regarding "poor effort and malingering" but without reconciling her own previous determination that Dr. Clodfelter's conclusions in this regard were potentially invalid and that the "EE's MMPI-2 findings are indicative of serious psychopathology . . . and not malingering."

Plaintiff appealed the termination of his STD benefits. He received a letter from Sedgwick on October 7, 2009 stating that the termination of his STD benefits from July 9, 2009 through September 2, 2009 had been upheld. (AR 549.) As part of this appeal, Sedgwick retained Dr. Goldman, a psychiatrist, who reviewed Plaintiff's medical records and completed a teleconference with Dr. Crandell. Dr. Goldman concluded that the "information was not particularly compelling and does not objectively support the presence of a debilitating or incapacitating mental disorder that would have prevented you from working any type of job from 7/9/09 through 9/2/09." (AR 550.) In reaching this conclusion, Dr. Goldman noted that [t]he bulk of the information is subjective and self-reported" and that "a report from Dr. Clodfelter from February 2009 suggests symptom magnification on the MMPI." Dr. Goldman thus relied on Dr. Clodfelter's "exaggerating" determination, without assessing the validity of that determination. Moreover, Dr. Goldman noted that "[n]europsychological issues and any potential impairment would best be assessed by a peer reviewer with expertise in neuropsychology," and he therefore limited his determination to "a strictly psychiatric

perspective." However, to the extent Dr. Goldman suggested review by someone with expertise in neuropsychology, Sedgwick concluded that "referral to neuropsych IPA is not necessary" because Plaintiff was "not treated by a neuropsych" during July and August 2009.[16]

Plaintiff pursued a second level appeal, and as part of that process, Defendants retained Dr. Robert Polsky, a psychiatrist who did not examine Plaintiff but reviewed Plaintiff's medical history and held a teleconference with Dr. Crandell. Dr. Polsky also reviewed Dr. Clodfelter's report. He noted that Dr. Clodfelter's test results showed that Plaintiff was currently functioning in the high average range of overall intellectual ability, but with "some mild deficit in immediate memory." (AR 1035.) In addition, Dr. Polsky concluded that Plaintiff's "delayed memory was moderately impaired." (Id.) Dr. Polsky also noted "significant deficits on multiple measures of test of executive functioning." (Id.) However, Dr. Polsky concluded that, on the basis of Dr. Clodfelter's finding that Plaintiff was exaggerating and over-reporting his symptoms, "the clinical findings are all felt to be suspect, and their impairment potential is also highly suspect." (Id.) Dr. Polsky stated that "the clinical documentation does not demonstrate the employee to be disabled from any type of work (any occupation) from 07/09/09 through 09/02/09." (Id.) In reaching this conclusion, Dr. Polsky relied primarily on Dr. Clodfelter's concern that Plaintiff was exaggerating and over-reporting his symptoms, but Dr. Polsky did not address Dr. Grimes' opinion that Dr. Clodfelter's determination of exaggerating and over-

---

[16] However, as noted above, Dr. Crandell had performed neurocognitive testing on Plaintiff in August 2009. Dr. Crandell's office note from August 24, 2009 indicates "significant cognitive deficits" and that Plaintiff's "neuro-cognition index was extremely impaired." (AR 726.) In addition, Dr. Crandell's office notes during July and August 2009 indicate that during that time, Plaintiff continued to struggle with anxiety at being in public, impaired reasoning due to underlying suspiciousness and distrust of others, an inability to control his temper when dealing with others such as check out clerks, a resulting avoidance of any public situations, and anxiety over being "followed or watched." (AR 723-26.)

reporting was not supported, nor did he discuss the findings of Dr. Phan, who was the psychiatrist that performed the independent medical examination for Sedgwick and found that Plaintiff could not return to any work for at least six months.

On April 12, 2010, the Disability Service Center notified Plaintiff by letter that following his second level appeal, the denial of this STD benefits had been upheld. (AR 1059-61.)

C.     Reasonableness of Defendants' Determination of Non-Disability

In the cross-Motions for Summary Judgment presently before the Court, Defendants contend that the decision of the Plan Administrator was reasonable, while Plaintiff contends that the decision was unreasonable because the denial was not supported by substantial evidence. In considering whether the determination was supported by substantial evidence, the Court notes that the record includes information from four professionals who actually interacted with Plaintiff. The first is Dr. Crandell, Plaintiff's treating psychiatrist, whose opinions are set out at length above. The second is Psychologist Clodfelter, who performed the independent medical examination and concluded that no accurate appraisal of Plaintiff's psychological status could be made based on the determination that Plaintiff exaggerated and over-reported complaints and symptoms. The third is Dr. Phan, the psychiatrist who subsequently performed an independent medical examination and diagnosed Plaintiff with Bipolar Disorder, Generalized Anxiety Disorder, Panic Disorder, and Obsessive Compulsive Disorder and concluded Plaintiff could not return to work and should be evaluated again in six months. The last was Ms. Frost, the vocational case manager, who concluded that Plaintiff had been unemployable since July 2008 based on his mental disorders, cognitive deficits, and the risk of violent behavior. Thus, none

of the professionals who actually interacted with Plaintiff concluded that he could return to work; Dr. Crandell (the treating physician) and Dr. Phan (the psychiatrist performing the independent medical examination) concluded that he suffered from severe mental disorders that precluded him from working; Ms. Frost (the vocational expert) concluded that it was "inconceivable" that any employer would hire Plaintiff due to the risk of violence; and Dr. Clodfelter (the psychologist preforming the earlier independent medical examination) concluded that no accurate evaluation could be made.

In their Motion for Summary Judgment, Defendants contend that the "problem with the opinions and conclusions of" Dr. Crandell and Dr. Phan is "that they were based on what [Plaintiff] told them." (Def.s' Mem. in Supp. of Mot. for Summ. J. [Doc. #32] at 17.) Defendants contend that based on Dr. Clodfelter's conclusion that Plaintiff was exaggerating his symptoms, "the opinions of any professional who concluded that [Plaintiff] was disabled were correctly rejected by Sedgwick during the administrative appeal." (Id. at 18.) Thus, Defendants place great weight on Dr. Clodfelter's opinion that Plaintiff was exaggerating and over-reporting his symptoms. Indeed, they argue that her conclusions justify rejection of "any professional who concluded that [Plaintiff] was disabled." (Id.)

Defendants do not discuss, however, the evidence in the record which calls into question the validity of Dr. Clodfelter's conclusions. As discussed above, Dr. Clodfelter noted that Plaintiff had cognitive impairments and had passed a symptom validity test measuring his effort on the cognitive tests. Dr. Clodfelter also noted that Plaintiff's "extensive psychiatric history suggests serious problems" and "[h]is self-report of severe interpersonal problems, as well as

anger management problems, would potentially limit or restrict his functioning in the work setting." Dr. Clodfelter nevertheless discounted those results because Plaintiff had scored very high on a scale of the MMPI-2 and was "exaggerating and over-reporting." However, her test results are undermined by Sedgwick's own psychologist, Dr. Grimes, as discussed above, who flatly disagreed that a conclusion of malingering could be based on the results of the MMPI-2 administered by Dr. Clodfelter, and who opined that those test results were "consistent w/ severe psychopathology."[17] (AR 58.) In addition to Dr. Grimes' criticisms of the MMPI-2 conclusions, an entry in the claims record likewise calls for the MMPI-2 to be given again, due to the multiple factors that could have led to the high score, although no additional MMPI-2 was performed. Moreover, the medical examination by Dr. Phan was performed after Dr. Clodfelter's review, and Dr. Phan did not raise any concerns of exaggeration or over-reporting. Finally, the Court notes that the professionals retained by Sedgwick to review Plaintiff's claims during the appeals process, Dr. Goldman and Dr. Polsky, did not have any direct interaction with Plaintiff, and with respect to their conclusions, Dr. Goldman recommended further review by someone with expertise in neuropsychology, although no such review was undertaken, and both Dr. Goldman and Dr. Polsky based their conclusions in large part on Dr. Clodfelter's questionable determination of exaggeration and over-reporting, without reconciling any of the other evidence from Dr. Crandell or the independent examining psychiatrist, Dr. Phan.[18]

_____

[17] Defendants fail to address how Dr. Grimes could so conclude in April 2009, yet in August 2009 conclude that the available medical information did not support a finding of disability.

[18] The Court notes that Dr. Clodfelter also implied that Plaintiff may have been exaggerating just to get disability benefits because "[a]lways in the case of a claimant receiving disability benefits there is the aspect of secondary gain, in terms of income." Dr. Clodfelter further concluded that "[i]n this case, there is also some evidence of adoption of the sick role, since he has clearly elicited the help of his family member in even his basic

Based on all of the above evidence, the Court cannot conclude that substantial evidence supports the decision to terminate Plaintiff's STD benefits. In their Memorandum, Defendants rely almost exclusively on the results of Dr. Clodfelter's testing and findings to justify the denial of Plaintiff's STD benefits. However, Dr. Clodfelter never opined that Plaintiff was not disabled. She only determined that it was impossible to state whether he was disabled. (AR 247.) In light of the defects noted by Dr. Grimes with regard to Dr. Clodfelter's test results, and the failure to undertake an additional MMPI-2 and additional neuropsychology review as recommended by Sedgwick's own reviewers, the Court finds that the denial of Plaintiff's STD benefits is not reasonable to the extent that it was based upon Dr. Clodfelter's "findings" that Plaintiff was malingering and over-reporting.

Moreover, Defendants fail to address the evidence submitted by Plaintiff's sister regarding the effect of Plaintiff's mental disorders on his daily life. The description she gave of the condition of Plaintiff's home, Plaintiff's interpersonal communication problems, and his struggles to complete daily activities raises serious questions as to whether he could function at any type of employment. Defendants also discount or completely disregard the years of notes of office visits submitted by Dr. Crandell, and the results of Dr. Phan's independent psychiatric examination of Plaintiff, because their opinions and conclusions "were based on what [Plaintiff]

---

household activities and self-care." (AR 248.) However, Dr. Clodfelter's report indicates that at the time she prepared her report, she had not reviewed any of Dr. Crandell's records, other than a single office note from January 2009. Moreover, Plaintiff's family members have provided a stark picture of Plaintiff's existence that led to their intervention and role in his care, as set out at length above, and in awarding Social Security benefits, the Social Security Administration concluded that Plaintiff could not handle his own funds. In addition, Plaintiff remained on significant doses of powerful anti-psychotic medications. Defendants did not attempt to reconcile any of this evidence in accepting Dr. Clodfelter's conclusion that he was "exaggerating" or adopting a "sick role."

told them." (Def.s' Mem. in Supp. of Mot. for Summ. J. [Doc. #32] at 17.) Yet, Dr. Crandell reported results of his neurocognitive testing of Plaintiff that are not fully addressed. In addition, Dr. Crandell's notes reflect not only what Plaintiff told Dr. Crandell, but also Dr. Crandell's observations of Plaintiff over many years. (See, e.g., AR 575-76, 723.) In their Motion for Summary Judgment, Defendants contend that the opinion of a treating physician is not entitled to any special deference. See Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). However, the Court notes that while this is true, the Supreme Court has also noted that plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id. at 834. Defendants' rejection of the import of Dr. Crandell's office notes and neurocognitive testing amounts to little more than an arbitrary refusal to credit the evidence from Plaintiff's treating physician, which is not permitted.

In summary, all of the psychiatrists who have examined Plaintiff have found him to be totally disabled and not able to return to any type of work. Dr. Clodfelter, a psychologist, concluded that a disability determination could not be made, but the validity of her conclusions of malingering and over-reporting are in serious doubt due to the observations of Dr. Grimes. The remaining consulting physicians did not examine Plaintiff prior to concluding that he was not disabled, and the conclusion of Dr. Polsky, upon whom Defendants primarily rely, was based to a large extent on the now discredited conclusions of Dr. Clodfelter. There is overwhelming evidence in the record showing Plaintiff's disability resulting from bipolar disorder and other serious mental illnesses during the period July 9, 2009 through September 2, 2009, based on both his cognitive deficits and his social anxiety and inability to relate to others

in a work environment raising concerns for the safety of Plaintiff and his co-workers if he returned to work. Based on this review of the administrative record, this Court concludes that Defendants abused their discretion by denying Plaintiff's claim for STD benefits because there is not substantial evidence in the record to support their decision to terminate Plaintiff's short term disability benefits. Therefore, Defendants' denial of STD benefits should be reversed, and Plaintiff should be awarded the full extent of STD benefits as well as the associated employment benefits for this period.

## IV.    CLAIM FOR LONG TERM DISABILITY BENEFITS

Finally, the Court notes that Plaintiff also argues that this Court should determine that Plaintiff is eligible for LTD benefits. Pursuant to Plaintiff's LTD Plan, he must be disabled "for a period beyond the Waiting Period." (DEF 131.) The "Waiting Period" is the 52-week period for which a claimant receives benefits under the STD Plan. (DEF 130.) Plaintiff does not dispute that his STD benefits were terminated prior to the expiration of the 52-week waiting period. (Br. in Supp. of Pl.'s Mot. for Summ. J. [Doc. #30] at 8-9.) This early termination formed the basis of the denial of Plaintiff's request for LTD benefits. (AR 1186-87.) Therefore, Defendants have not finally determined whether Plaintiff meets the LTD disability standard, which is similar to but not identical to the STD disability standard. However, the initial indication in the present Administrative Record is that Ms. Westin, Defendants' case manager for Plaintiff's LTD benefits claim, noted on October 14, 2009, that Plaintiff "meets the definition for ltd" due to the reports that Plaintiff's symptoms "demonstrate severity in functional impairments which interfere with ability to complete work activities and appropriately

interact with others." (AR 1131.) Thus, based on the information available, it appears that Plaintiff's LTD claim would have been approved had he completed the requisite waiting period.[19]

An ERISA claimant is generally required to exhaust his administrative remedies before receiving relief in court. Hickey v. Digital Equip. Corp., 43 F.3d 941, 945 (4th Cir. 1995). To circumvent this requirement, a plaintiff must make a "clear and positive" showing of futility. Id. If this showing is made, the Court has discretion to reach the underlying claim even though the administrative process has not been exhausted, or, alternatively, to remand for exhaustion of remedies so that there is a final decision for the Court to review. In considering this issue, the Fourth Circuit has noted that "[b]y preventing premature interference with an employee benefit plan's remedial provisions, the exhaustion requirement enables plan fiduciaries to efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions. Indeed, subsequent court action may be unnecessary in many cases because the plan's own procedures will resolve many claims. In short, Congress intended plan fiduciaries, not the federal courts, to have primary responsibility for claims processing." Makar v. Health Care Corp. of Mid-Atlantic, 872 F.2d 80, 83 (4th Cir. 1989).

In this case, the Court cannot conclude that Plaintiff has made a "clear and positive" showing of futility with regard to LTD benefits. As noted above, the preliminary determination

---

[19] The Court notes that according to an entry in Plaintiff's claims record dated November 13, 2009 by LTD case manager Ms. Westin, Plaintiff was only 5 days short of completing the 52-week waiting period at the time his STD benefits were terminated. (AR 1132.) Given the present procedural posture, all medical information in the record stops in early 2010.

by the LTD Case Manager was apparently to approve Plaintiff's LTD claim after he satisfied the requisite waiting period. In these circumstances, a determination as to long term disability benefits is best made by the Plan Administrator, and considered by this Court if necessary on review of a final decision by the Plan Administrator on a full record appropriate to that Plan. Accordingly, this Court recommends that Plaintiff's motion for summary judgment with respect to LTD benefits be denied, and that the claim for LTD benefits be remanded for a determination by the Plan Administrator.[20]

### III.    CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that Plaintiff's Motion for Summary Judgment [Doc. #29] be GRANTED as to his eligibility for the full extent of STD benefits and any other associated employment benefits, but DENIED as to his eligibility for LTD benefits.

IT IS FURTHER RECOMMENDED that Defendants' Motion for Summary Judgment [Doc. #31] be DENIED except that Plaintiff's application for LTD benefits be remanded to the Plan Administrator for an eligibility determination.

This, the 13th day of March, 2012.


_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge

---

[20] As a matter of administrative procedure, if this Recommendation is adopted, the present case should be closed, and any separate appeal with respect to LTD benefits should be opened as a new case but identified as related to the present case.